Case No. 24-3162, United States of America v. Stephen Johnson Appellant. Ms. Forrest for the Appellant, Mr. Winn for the Appellant. Good morning, Your Honors. Good morning, Your Honors, and may it please the Court. My name is Courtney Forrest. I represent the Appellant, Stephen Johnson. I'd like to reserve one minute for rebuttal, please. In this case, the District Court wrongly denied two of Mr. Johnson's motions to suppress that raised violations of his Fourth Amendment rights. The Devices motion and the Google motion. If this Court reverses either of those decisions, it must vacate Johnson's convictions and remand for a new trial. There are many issues that are discussed in the briefs, and I'm happy to answer any questions that you have today. But given my short amount of time, I'm going to focus primarily on two points. That would be the warrantless search of Mr. Johnson's phones and his laptop computers, and the good-faith analysis with respect to the Google motion. So I'll begin with the Devices motion. The Devices motion arises from law enforcement's search of all of Mr. Johnson's cell phones and laptop computers. No warrant ever purported to authorize the search of those devices, and the government doesn't contend that any warrant exception applies. This is an exceptionally straightforward case of the police exceeding the scope of a warrant. You're talking about the residence warrant. Yes. What about Rule 41? So Rule 41, Your Honor, is-doesn't apply to this situation because the text of the rule is clear that it's a temporal limitation-excuse me for a moment, if I could find that in my notes. So, E2B addresses the temporal limitation in Section E2A1, which otherwise requires the execution of a warrant within 14 days. So the key language in Section E2B is in the second sentence, which allows later review of a device consistent with the warrant. So if the warrant itself authorized the seizure, the seizure could take place beyond the 14 days. If the warrant authorized a search, the search could take place beyond those 14 days. But here, the warrant did not authorize the search. So Rule 41 can't change the scope of a warrant, and it can't change the limitation. What if the warrant said that it offers law enforcement to obtain the necessary biometrics from Johnson for the purpose of attempting to unlock the device's security features in order to search the contents as authorized by this warrant? So that paragraph, Your Honor, which is on-which is in Attachment B, which is describing property to be seized, that paragraph begins during execution of the search of the premises described in Attachment A. And it concludes that the biometrics may be used for purposes of attempting to unlock the devices in order to search the contents as authorized by this warrant. So it's as authorized by this warrant that is the language that controls. The warrant does not otherwise authorize the search of the devices. Does the warrant incorporate by reference Attachment B? It does incorporate by reference Attachment B. It does not incorporate by reference the application for the warrant. So the warrant has to be evaluated on its plain terms, including those of- So the warrant also says it specifies for any digital device, they can-they can search or seize information, correspondence, records, and documents constituting evidence of the possible receipt, distribution, or production of child pornography. So that seems to also apply to the digital device and the information. Like, they can seize that. So between Attachment B and that language, I don't see why this warrant doesn't cover it. The difference, Your Honor, is because there is a difference between seizure of data and search of that data. So Attachment B combined with Attachment A, this warrant authorized three things. They could search the residence, they could seize the physical devices, and they could seize certain data. And how that was executed was as follows. So the first point, the search of the residence and the seizure of the physical- You're really slicing this so fine because then there's also the language about searching the contents as authorized by this warrant, which implies that the warrant is authorizing the search. But it is not, Your Honor. It just sounds very hypothetical, what you're saying. Like, it's not just sort of a common-sense, plain reading of what this warrant says. I think what you're saying is plausible, but why is that the best reading of this warrant? The best reading of the warrant, Your Honor, is because if you look at Attachment A, which lets this property to be searched, it's a single page. This is JA0096. The only thing that was to be searched was the residence. You could seize the devices and you could seize certain data. And the way that the police seized certain data was one of two ways. They seized-  JA0096, Your Honor. So as I mentioned, the warrant authorized three things. The seizure of the search of the residence, the seizure of the devices, and the seizure of the data. The data search was executed- You seized just the data without revealing what is on the device. That's exactly what happened here, Your Honor. So once the device- That's an impossibility, though. If you cannot review what is on the device, then you have no way of knowing whether you seized only the data that the warrant allowed you to seize and not other data that's on the device, right? Well, that is exactly what happened. So what happened is the police seized all of the data- I know that's what happened. What I'm asking you is how do you possibly seize just the data that the warrant allowed without going through and looking at the contents of the device? That's my question. My question is not what happened here. I'm asking you about the possibility. So the warrant- Or the impossibility. I understand, Your Honor's question. The warrant authorized the seizure of certain broad categories of data. For example, all of the internet browser history, all communications, all text messages, all emails. The police could have. They did not. But they could have gone into the devices and imaged only that data if they had wanted to parse certain files, certain folders, and seize those categories. But once you start reviewing the data in the categories, what part of the internet history might be used in a prosecution? Which of all of the communications on the device could be incriminating? That is a search. That is what needs to be authorized by a search warrant. The problem with reading this warrant so broadly that you could seize any device and then you could search all of those devices, there's a number of problems with that. But focus on- I still haven't answered my question. How do you, if you're the officer, how does the officer determine whether he has or has not seized only the information that the warrant allows him to seize without going through and looking at all the material on the device? How can that be done? Explain that to me. As a technical matter, and I'm not a technical expert, but as I try to, as I understand your honest question, I think it would be possible to go through and seize certain categories of data. So you could search- But you have to look at all the data to do that. You wouldn't necessarily have to search the particulars of the data to do that. So, for example, they could have gone into the phone and excluded his Uber app. They could have excluded his Starbucks app because that was clearly not within the types of data that was meant to be seized here. Are you proposing they'd use as they're executing the warrant? I think what Rule 41B would allow is that type of parsing the seizure of the data could happen later. If you have, Judge Randolph asked you a question, how are they supposed to do this when the warrant says they can seize child pornography, evidence, information? And how are they supposed to know that they're seizing the right thing without looking at what's on the phone? And you're saying, yeah, they can. And I'm just in terms of the practical logistics of executing a search warrant, are you proposing that they actually do what you're saying in order to answer Judge Randolph's question? It's one option. I don't think that would be done on the scene. I think that would be done in the lab. I think that's completely impractical. I mean, if you know what it's like to execute a search warrant, they just go in and take a bunch of stuff. And they don't have time to sit there and start parsing and looking at things the way you're proposing. And I'm not proposing that they do it on scene. I'm not even proposing that. I thought you just said that was a possibility. I said that was a possibility to get at the issue that Judge Randolph was raising. What they did here is they took an image of the phones and they seized all the data. And we're not arguing that that was improper. Once they had taken the full image of the phone and seized all the data, including the data they were allowed to seize, it may have been overbroad. We're not challenging that under the practicalities and the necessities that police are facing. But what we're saying is once they start going through, they hand the images to a totally different government agent who then starts analyzing and invading the privacy interests in the phone, not just the property interests and the seizure. That's why this exceeded the scope of the warrant. I'd like to briefly move on to good faith, if I could, Your Honor. So the good faith relates to the Google motion. The district court ruled that the private search doctrine likely wouldn't apply to Detective Sullivan's review of the cyber tip files, but ruled the evidence was admissible under the good faith doctrine. And that's where the district court erred. So that's where I wanted to start my focus. So there are actually two good faith analyses presented by the motion. And I want to focus just on the one that applies to the initial review of the cyber tip files, not the later reliance on the warrant for the account in the interest of the criminal. So Haring instructs that when police exhibit recurring or systemic negligence, the deterrent value of the exclusionary rule is strong and outweighs the cost. And this is precisely the type of case that Haring was anticipating because the conduct here was recurring. It happened in every case that Sullivan received where he received cyber tip files. The record is clear that's hundreds of tips every year. And there was no objectively reasonable basis for him to believe that was lawful because in all other cases where the Supreme Court has found police action objectively reasonable, there was a specific unambiguous authority. Here's my question for you. It seems to me that a combination of the independent source doctrine under Murray and the good faith doctrine that we're talking about seems to save that search. Because that officer made a mistake, thought it was okay to look at these things. But when an AUSA told him, you need to go get a warrant, and this warrant has to be, the basis for it has to be independent of what you looked at, he did that, which is very much on all fours with Murray. He went and got an independent source, I guess, search warrant approved ability to look at that information. And the twist that makes this a little bit different from Murray is that the magistrate judge says, you don't need a warrant, you know, because the magistrate judge believed that it fell within the private search doctrine. It seems to me that he can rely in good faith on what the magistrate judge thinks. The magistrate judge found there is probable cause, but I'm not going to sign a warrant because the magistrate judge didn't want a proliferation of warrants that he thought were unnecessary. But why can't the officer rely on what the magistrate judge tells him is correct and then proceed to look at this without a warrant because the magistrate judge said it was okay and rely on Murray for the fact that that's an independent source for the ability to look at that information? Okay. I see I'm out of time. May I respond to your question? Yes. So in this case, the government has abandoned its reliance on the independent source doctrine. We can affirm on any basis that's a matter. I understand. And the reason that it doesn't apply here is that the independent source doctrine only applies when the seeking of the warrant is truly independent of the initial constitutional violation. So here it's clear that Detective Sullivan would not have gone to the magistrate judge to seek a warrant had he not already reviewed the files, drafted a warrant application that included information from those files, then gone to the prosecutor. That's not how the independent source doctrine works. It just has to be that the search is based on an independent basis, which is the warrant. I mean, it's not the reason they go and get the independent source is not part of the search is based on an independent Fourth Amendment-approved source, then that information is not suppressed. And I don't see anything untoward or nefarious about an officer who made a mistake and an AUSA tells him, you know what, you better go get a warrant, and he goes and gets the warrant that's completely independent of the mistake. He didn't rely on the information that he viewed in the cyber tip in order to get the independent source warrant. That seems to me on all fours with Murray. The only twist is that the magistrate judge didn't just give him a warrant. The magistrate judge had his reasons for not doing so, but did find there was probable cause and told him, you can go ahead and search. I don't see why that doesn't solve this whole issue. Well, another reason it doesn't solve the issue is that the magistrate judge's ruling and analysis cannot be considered completely independent because in the application that Detective Sullivan presented to the magistrate judge, he included the fact that he had already looked at the files. And he said, I'm not relying on anything I learned from the files, but just so you know, I have already looked at them. So whether that consciously factored into the magistrate judge's decision or not, he knew that the officer had already looked at the files, had seen enough, that he was then coming to him to get a warrant because he wanted to further investigate. And that is not- The answer was going to be the district court didn't think that that's the way Murray worked. That if in any way his review of the videos prompted him to get a warrant, then it fell outside the scope of Murray, which is the way that lots of courts of appeals have interpreted Murray. Not just that, oh, you used information that wasn't tainted and we got a warrant and that's the end of the story. You still have to show that it's not a fruit of your illegal search. And the way you show that is that the illegal search didn't prompt to getting a warrant. That was discussion in Murray and footnote in Murray in response to the dissent, right? Yes, I believe your honor is exactly correct. And I believe that's what we argued in our opening brief. That detective Sullivan's application for a warrant to review the files he had already seen was not independent of, it was a fruit of that initial unconstitutional violation. Before you sit down, put aside good faith and inevitable discovery and independent source, put that aside. I have a great difficulty understanding why your client had a reasonable or in fact any expectation of privacy given the statutes that govern here. And the statutes authorized Google to include visual images of what Google found on your client's whatever devices or whatever he was downloading. And given the fact that the statutes, I'm talking about, was it 2280, 2258A and 2258C. Given those statutes, it's almost like the government announcing, listen, if you want to download something on your computer, be aware that it's going to be looked at and in fact can be reported to this NC organization and ultimately to law enforcement authorities. So where does the reasonable expectation of privacy come from? So your honor, many courts have held that individuals do maintain reasonable expectations of privacy in files that they have saved to Google accounts or similar accounts, not withstanding that statute and not withstanding the terms of service. I'm not talking about general files. I'm talking about files that contain child pornography. You have no reasonable expectation that you're going to keep that to yourself when the statutes authorize its disclosure. There is certainly an expectation that a private actor, Google, may scan and review those files, which is what happened here. But what happened is no human at Google looked at the actual file that was in Mr. Johnson's account. So what we had was an algorithmic match, a hash match, that produced a list of numbers and letters and file names. It looks like, I don't have it here, but it's just a PDF. It's just text. And so what the private search doctrine says is that you still have a reasonable expectation of privacy in anything that exceeds the scope of a private actor's search. So what the court has to do is compare the scope of what Google did to the scope of what Detective Sullivan did. The scope of what Google did is it produced a PDF document that said this matches this hash. It has this file name. So if you picture a document of text, this is the actual report. It looks like this. And then if you put that on one half of your screen and on the other half of your screen, you open a video. That video shows people. It shows children. It shows adults. It shows sex acts. It shows a place. You know that, though. Aren't you missing a step? I thought that when the NC organization sent the material to the D.C. Metropolitan Police Department task force, it included thumbnails of each one of the 220 visual, whether they were videos or pictures. Isn't that correct? Nick Mick had those in a zip file. No one at Nick Mick viewed those thumbnails, viewed any aspect of the files. Detective Sullivan was the first. It's like Photoshop. You get thumbnails. And the first thing that Officer Sullivan did was enlarge the thumbnails. They're that big, right? But you can enlarge them to the full screen. And his testimony was that's exactly what he did. He enlarged them. The only question we have is whether if he clicked on it, before he clicked on it, he had to get a warrant. That's the question, isn't it? I think even viewing the thumbnails, enlarging the thumbnails, is exceeding the scope of the private search. No one at Google looked at the thumbnails. Enlarging the thumbnails exceeds the scope? I don't understand that at all. It reveals facts of significance. There is a virtual certainty by looking at an image, you are going to learn facts of significance, that's the standard from Jacobson, that could be, that exceeds the scope of the private search. And here, you know, that's exactly why Detective Sullivan was doing it. So if he just, instead of clicking or instead of enlarging it, he got a magnifying glass and looked at it, that would be, he'd have to get a warrant to do that? I believe so, yes. Because any image is going to exceed the scope. Yeah. Okay. Can I ask you another question about the independent source doctrine? I understand you to be saying that it's a fruit of him looking at the cyber tip, even if he goes and gets a warrant. But why is it the AUSA that told him to get the warrant, an independent source? Because that's not based on what's in the cyber tip. Like, in order for any law enforcement officer to proceed with a prosecution, they have to go to the AUSA. And they have to get, even if they want to get a warrant, they have to go to an AUSA. An officer goes to AUSA and says, got a cyber tip, want to proceed with whatever the investigation is going to be. AUSA says, you need a warrant. He goes and he gets a warrant. That's not based on what's in the cyber tip. Well, I think we have to distinguish between the cyber tip being the text file that says this is a match and this is the file name, and actually opening the videos. So if he had only looked at... My question is, what if it's not based on opening videos? He's got to go to the AUSA no matter what, if he wants to do anything. And the AUSA says, to open that, go get a warrant. And he goes and does so. That's not a fruit of what's in the contents of the cyber tip. That's my question. Is it? That is correct. And if he had done that, if he had just said, we have some Google hash matches. I don't know exactly what it means. I don't know exactly how they're matching. I haven't looked at the files. Should I go get a warrant? I think that would be an entirely different case. But I'm saying him going to the AUSA is not necessarily based on what's in the cyber tip. So I understand that factually it didn't happen the way you said, which would have been ideal. But given that he has to go to AUSA no matter what, and the AUSA says get a warrant, and he goes and gets a warrant, is that a fruit of the content? Because what's unlawful in your view is the contents of the cyber tip being a part of the scenario. And is it really a part of the scenario? If he's got to go to AUSA anyway, the AUSA said, go get a warrant. He went and got a warrant. That seems to me consistent with your view of independent source theory to make this an independent source. The AUSA is the independent source. The AUSA is not an independent source when he has presented the AUSA with the contents of the videos. So the first time he went to the AUSA, he had already looked at the videos. He had drafted a warrant application that described in graphic detail those videos. So even the AUSA then saying you need to go get a warrant, that was tainted by the contents of the files. If he had just said we have a match and I haven't looked at anything, we have a very different case. Thank you. Morning, Kelsey. Good morning, Your Honors, and may it please the Court. Connor Winn for the United States. This Court has many paths to affirm Mr. Johnson's convictions and sentence, but I intend to talk about the topics that opposing counsel has raised here unless the Court has questions about any of the other matters in this case. I'll pick up first right where opposing counsel left, and as to why even assuming there was some Fourth Amendment violation when it came to the opening of the cyber tip videos in this case, suppression would be unwarranted. Now, the government has raised three reasons that that is so, two variations of the good faith exception, and then an inevitable discovery exception in this case. And Judge Pan, because you were asking opposing counsel about the independent source exception, I'd like to start by clarifying why we think the inevitable discovery exception is the better way to conceptualize the argument against suppression here. And that's because to get to what Judge Wilkins was talking about in Murray, the Supreme Court suggested that the decision to seek a warrant in order for the independent source exception to apply needed to be independent of what was seen during the potential Fourth Amendment violation. Based on the evidentiary record here during the evidentiary hearing, it appears that Detective Sullivan may not have actually proceeded to seek a warrant if he had not, in fact, opened the contents of the cyber tip videos. Isn't that on all fours with the facts in Murray? Because they wouldn't have sought a warrant if they hadn't looked at the marijuana. My understanding of Murray is that they were, in fact, seeking a warrant in parallel to when the officers first entered the warehouse in Murray. There was a separate process. That's not accurate. Maybe I'm thinking of another case. Well, Your Honor, at the very least, in Murray, the Supreme Court does have that line that if the contents of what we're seeing during the Fourth Amendment violation prompted the seeking of the warrant, that might be enough to render the independent source exception. In Murray, there was a serious question about whether it was an independent source. And one of the problems with the analysis that Justice Scalia, with all due respect, went through is if the police entered that warehouse and there was nothing in it, it was completely bare, they wouldn't have gone and gotten a warrant because that would have been a waste of time. And so to say that it was totally independent, you know, what they saw was totally independent of their seeking a warrant is pretty much of a big stretch. And you notice that the case was remanded for a determination. And I can tell you what happened on remand. On remand, the district judge suppressed all the evidence, and Mr. Murray and Mr. Carter were set free as a result of that. And I know that because I argued Murray in the Supreme Court. And I'll take your word for it, Your Honor. Now, whether one wants to think about it as independent source or not, I mean, that language that is in the Murray decision potentially counsels against applying it in that way here. And it's not necessary to do so given the government's good faith arguments and the inevitable discovery argument. But just so that we're clear, is the government contending that so long as the warrant application that went before Magistrate Judge Faruqi made out probable cause and didn't include any information within the declaration, et cetera, that came from viewing the videos, that that's the only question that we have to answer with respect to whether that warrant is a fruit of viewing the videos? In other words, is the government arguing that you don't have to do some sort of attenuation analysis, either attenuation or inevitable discovery or independent source? All that matters is that there was probable cause and they saw the warrant. So to be clear, I think one way to go about that would be an inevitable discovery argument, which is, in essence, that even if Detective Sullivan had not opened the cyber tip, had needed a warrant to open the cyber tip videos, he would have secured such a warrant given Google's hash match reporting, the thumbnails that he saw in plain view, which revealed CSAM. He could tell what was in these files even without opening them. So if he, in fact, needed a warrant, I think there's every indication here based on the record to conclude that he would have gone to the prosecutor to seek a warrant. They would have then ended up in front of Judge Farooqui, and in this case, likely would have proceeded exactly as it had. If you suppress here because of a violation on the theory that counsel for the defendant proposed, wouldn't you only suppress the four files that he opened? That's exactly correct. And not the 216 that remained? That's exactly correct, Your Honor. You would suppress those four files and any fruits of those files that weren't otherwise covered by an exception to the exclusionary rule. Specifically, one of the ones we raised in our brief that I think covers this point very well is the second version of the good faith exception that applies here, the one based on where the government has disclosed an alleged antecedent Fourth Amendment violation to a magistrate judge, and the magistrate judge then issues warrants as the government goes to continue its investigation. Then anything discovered through those warrants isn't suppressible under the good faith exception. And this court's decisions in both Burnett and Thornton cover that very well. I think it's notable that Mr. Johnson, in his reply brief, he tries to take Burnett on. I'm not sure that that's persuasive. In fact, I don't think that it is. But he doesn't even mention Thornton, and that's because Thornton is squarely on all fours with the theory that I'm proposing here, where there was arguably an alleged antecedent Fourth Amendment violation disclosed to the judge that issued warrants that secured the evidence that then proved critical to the convictions at trial. And this court affirms saying that the Leon good faith exception forbade suppression in that instance. I don't see how that is meaningfully different from here. Let me ask you, Detective Sullivan testified at the suppression hearing, and on direct, he testified that if he looks at the thumbnail and it looks like it has CSAM, child sex abuse material, he opens the file and reviews it. Then under questioning by the district court judge, he amended his answer, cleaned it up a little bit, and said, if it's a thumbnail of a video that I recognize because I have seen it before in the video that I saw before had CSAM, then I review the video without a warrant. He testified that that was his practice. What exception to the warrant requirement or how does that fall within the private search doctrine? So I think that in the context of the thumbnails, when you just see the thumbnail, it's the government's position that that amounts to plain view. You don't need a warrant to look at the thumbnails or to expand them or enlarge them in that way. To actually open the file, how the private search doctrine maps onto that depends on what one thinks of the government's merits argument in this case. That's because the government has recognized that individual users have a separate expectation of privacy in files, even if they are copies of files, right? You and I could have a copy of the exact same file, and we each have an independent expectation of privacy in each of our files. So someone opening your file doesn't frustrate necessarily my expectation of privacy in my file. So you're not defending it. That means you agree that it's a violation of the Fourth Amendment to open that file. No, not in this case because how Google's hash matching technology frustrated Mr. Johnson's personal expectation of his privacy in the files that were transmitted. I'm talking about Judge Wilkins, a situation where there is no sort of hash matching that has occurred. Whereas in this case, Google has applied its hash matching technology to confirm that the file, in fact, holds CSAM that matches CSAM that has been historically viewed by a Google employee. You're saying Johnson's expectation of privacy is affected by Google's policy. So he has no right to a certain independent privacy interest in materials that he uploaded or downloaded on Google, I guess, platforms because of the user policy? Not just because of the user policy. It's actually Google's application of its hashing technology. And the way Google sets this up, right, is it has Google employees looking at images, then coming up with a unique digital fingerprint that Google's technology and algorithms will then search for across all of Google's platforms. And it's the combination of that historical review plus the algorithms scanning Google's... Let's see how that affects Johnson's privacy interest. I'm trying to understand your position on Johnson's privacy. Well, that's because Google's searching algorithms specifically target Mr. Johnson's file. They go into Mr. Johnson's file. They analyze its entirety. And in that moment, Google knows what is in there. There are no more secrets as to the contents of that file. But the Google declaration said, and Magistrate Judge Farooqui found in his order, that a Google CSAI match will, quote, matches intermingled with non-offending content. Correct. So you could have a match where the suspected video is completely 100% a copy of a video that the Google employee had reviewed before. Or you could have a situation where the suspected video might have parts of a video that Google had reviewed before but have other parts that Google hasn't reviewed and that have no offending content at all, right? So I'm going to say yes, but I have to qualify it a little bit. Yes, what you're saying is right. It is possible that Google's technology could identify a file that is slightly different from what has been historically viewed, and there could be content intermingled. It's not clear exactly how much of a deviation from the original file. Google's technology could recognize another file to be essentially the same. That's just not in the record. I mean, it's your order. Certainly. It's the government's version. And what Google said was that it matches files that are intermingled with non-offending content. Correct. It does. And all I mean to say is that is certainly true. I just can't tell you the full extent of that and to the extent that you're... But if it does at all, that exceeds the private search, and so that's not permissible under the private search doctrine. There are, I guess, four different other circuits that have looked at this type of scenario, and none of them, none of them would permit a search like this without a warrant where there's not an exact match between the Google fingerprint and what was uploaded or downloaded. None of them. If it's imprecise, it doesn't fit the private search doctrine, and that's why we have to look at the face and independent source and all these other things. So a couple of points on that. First, I am going to agree with you. None of the other circuits I think have addressed perceptual hash matching like we have here. Those other four cases are focused on hard hash matching. So that is true. Now, as to whether the other circuits would have come out differently on the particular variation of the technology here, I think that's uncertain, and I would... That's neither here nor there. There's no authority for what you're proposing, that you can look at this without a warrant. There's no legal authority for it. You're asking for something new. It seems not to be consistent with the private search doctrine, which says that what the government does cannot exceed the scope of the private search. If Google's private search only dealt with very precise fingerprinting stuff that their staff has looked at and put into a database, and Mr. Johnson's files that were presented in the cyber tip go beyond that, and if Officer Sullivan looked at anything beyond what was in that little fingerprint, then you cannot rely on the private search doctrine. So then we have to look at good faith, independent source, inevitable discovery, whatever it is, but private source doesn't help you, right? Judge Pan, I think that depends on how one understands the opinion in Jacobson, and this court has no precedent on the private search doctrine prior to this case. This is likely to be the first case to really grapple with those, with the meaning of Jacobson. I'm not sure that the private search doctrine actually functions in that way, and what I think that really comes down to is how this court interprets the Supreme Court's language in Jacobson as to whether officers are going to learn anything new of significance when replicating the search by the private actor. Here, the government would submit that whatever they were going to find in this file, it was nothing new of significance. They knew that the file, based on Google's digital fingerprint technology— There could have been more that wasn't in the fingerprint technology. I think that's true, just as in Jacobson. Then how can you say that we know that they're not going to learn anything new? So we're not saying with absolute certainty, right? Remember, Jacobson is focused on virtual certainty, which is something different than absolute certainty. Even Jacobson acknowledged in its private search analogy— But I'm trying to say there's no certainty at all, because we have no idea what's in this file. The fingerprint could be like six seconds long, and the file could be like two hours. There could be lots more CSAM in there. There could be more CSAM, but— I don't know how you could possibly say that this is okay under Jacobson. I think it's because the government doesn't consider that additional CSAM to be anything else of significance. What the government already knows, right, based on Google's coding, is it knows that this is a hash match to historically viewed CSAM. Google's coding through the A1, B1, A2, B2 function has informed NCMEC and then the government that the contents of that CSAM file depict prepubescence. Pubescence is the type of specific sex act that they're engaging in. All the government knows is that within this two-hour file, there's at least six seconds worth of CSAM. And so you're saying they can look at the whole file? Because it might—we know for sure it contains six seconds of CSAM? I think the First Circuit—so not in the context of hash matching specifically, but the First Circuit's decision in D'Andrea suggested that— Can you just answer my question? Is that the government's position? Yes. You think that just because they know that there's six seconds of CSAM based on their fingerprint hash matching technology, the government can, consistent with the private search doctrine, look at the entire two hours? That's your position? Yes or no? Yes with the qualification. With the qualification of the government isn't informed that there's just a six-second clip of CSAM in a two-hour video. That's not how the reporting from Google to the government works. And a reasonable police officer in this situation— How does it work? So Google reports that—sends over the file, says that this file is CSAM. They code it appropriately. They send over the file names. That's what we know. This CSAM means that it contains CSAM, but only the fingerprints that Google has in its database. That's correct, yes. That is what Google tells the government. And for each of these four files, Google told the government that it had not reviewed these four files, what the cyber tip says. Right. It said it had reviewed—as a historical matter, a Google employee had reviewed files with matching—well, it said MD5, which is a code for hard hashing, and that caused another slip-up in this case in terms of Detective Sullivan's understanding. But Google said that historically it had reviewed files that had hard hash matches to these files, even though it turns out Google was using perceptual hashing technology. Google was very clear that it had not reviewed Johnson's files that were on the Google Drive that they had appended to the cyber tip report. Correct. For the four videos that Detective Sullivan looked at specifically, that's right. Does Google have separate technology? Microsoft has that photo DNA. Right. Is Google the same? So I think what has been—and I don't want to speak for every digital company out there and how their technologies are working. There are variations among them. Hard hashing, I think, was the first iteration of this technology, and many companies are now moving to the perceptual hashing technology that you see in this case. It's more advanced. Do you have the appendix with you? Yes, on my laptop back at Council Table. Oh, on your laptop. Yes. There's a part of Sullivan's—Officer Sullivan's testimony that I find confusing, and I'll just read it to you. This is before Judge Nichols.  He's saying, my understanding was that he, the magistrate, decided that we did not need a search warrant to review the cyber tips. Question, what did the magistrate's decision mean in terms of your next steps? And this is where I'm confused. At that point, we resubmitted a Google search warrant and proceeded with the investigation. Question, and that search warrant was based on information you learned when you first reviewed the file? Yes, sir. A Google search warrant? The magistrate said you don't need one? So there were separate warrants. So the magistrate said that no warrant was needed to see the video files that were transmitted from Nick Nick to law enforcement. Once the magistrate judge issued that ruling, the government then went and sought a warrant for Mr. Johnson's Google account. So it's targeting something different. Oh, the Google account. The Google account. That's what that testimony is referencing. Got it. Okay. So, counsel, I tend to think that Murray covers this. I'm not sure why it's in your best interest to disabuse me of that. But what is the part of Murray that you think makes this-makes it not applicable here? Let's understand that. I don't want to say that Murray is definitively not applicable, Your Honor. What were you saying within Murray? I'd like to read that. Sure. So the PIN site is in Mr. Johnson's opening brief, and they quote the language in Murray. I don't want-I don't have the PIN site offhand, but it is in that brief. And it specifically uses the language suggesting that if the decision to seek a warrant is prompted by what is seen during the Fourth Amendment violations, then the independent source decision won't apply. But it's not within Murray. It also says what counts is whether the actual illegal search had any effect on producing the warrant, not whether some hypothetical illegal search would have been-would have aborted the warrant. Only that much is needed to assure that what comes before the court is not the product of illegality. So I understand that, to me, as long as the warrant affidavit doesn't rely on the-and I've always read Murray this way, so I'm going to go back and read it more carefully, that if the warrant that they ultimately procure does not rely on illegality, then it's okay. Certainly, that is at least a requirement of the independent source exception. I agree. I think the question we're having is whether the decision to seek that warrant has to be free from the taint of the Fourth Amendment violation. I don't remember the facts of Murray being free from the taint. I think that they got the warrant. I'll have to go back and read it, but my memory of Murray, which I taught for many years when I taught criminal procedure, was that they saw that the marijuana was there and then they got the warrant, which is exactly what happened here. At the very least, Your Honor, given the litigation risk of the statement that Mr. Johnson has quoted from Murray, the government has avoided going down that road, and it's really not necessary for this court to require it. I don't know why the government would avoid going down this road, but okay. That's because we think our good faith arguments are extremely strong, along with our merits arguments. Without Murray, good faith doesn't really affect the first search. So I agree with – well, the first search, the search of the cyber tip videos, that's a question about kind of the scope of the good faith. Relying on the private search doctrine for that, and I think that your arguments on private search are unfavorable. Well, they might ultimately prove to be wrong, Your Honor, but at the time that Detective Sullivan engaged a look at the cyber tip videos, two circuit courts have suggested that searches of the kind he understood himself to be engaged in were legal. Those searches dealt with exact matches. They did not deal with what he was doing. That's right. There was no case law to support what he was doing. So I agree with you, but he had an understanding, and you can see this in his testimony before Judge Nichols, based on how Google reported this. What story do you have that allows an officer to rely on the good faith doctrine based on case law that does not govern what he's doing, but because he thought it did? Do you have any case that says that? I would look to hearing whether the Supreme Court says the purpose of the exclusionary rule. That's the purpose of the exclusionary rule, but the cases that talk about good faith relying on prior existing law talk about either binding precedent of the circuit, which he did not have at all, or of the Supreme Court, or at least case law that's on point. There was no case law on point, and you're saying that we should say an officer who makes a legal mistake, he's not a lawyer, but really genuinely believed it was true is entitled to the good faith exception? I think that there's no case that says that. An officer's good faith legal mistake is not a basis for applying the doctrine. I mean, I do think that is the logic of hearing when it comes to— That's the logic, but give me a case. I can't point you to a case offhand, although I do think the Supreme Court— the Third Circuit's decision in Capston does recognize that it's a holistic analysis into whether the good faith exception should apply, and it looks at everything, the totality of the circumstances, including whether the officers sort of like negligence in the product of committing an error. Understood. I think that that is the basis for having a good faith doctrine. But in the meantime, there's huge bodies of case law about different types of good faith, and one type is reliance on law, and you don't have a single case in the reliance on law area of good faith jurisprudence that says an officer can do this. An officer just made a mistake, but he didn't mean it, and he's not a lawyer. He didn't understand the law, but because he didn't mean it, we should apply the good faith exception. That is not the way it works. He believed he was doing what the Fifth and Sixth Circuits have endorsed. He, in fact, wasn't. Exactly. In fact, does not provide under any case law that's existing a basis to apply the good faith doctrine. That may be true, but it's the government's position that the good faith doctrine should apply in that circumstance, Your Honor. So he testified that his understanding of the law about when he would need a warrant was that he didn't need a warrant if Google or whatever the Internet service provider was had reviewed the suspect videos. Historically, yes. So Detective Sullivan... No, he said that video. That's what he testified to. Your Honor, I think my understanding is that his practice aligned with what the Sixth Circuit validated in Miller, which was when he understood Google to be reporting that it had historically viewed an exact copy of the file that it then transmitted to NCMEC, that he was allowed to look at that without a warrant. Okay, so let's say we give him that, that he understood that that's what Miller held and that he was trying to follow Miller. To be clear, I noticed... How is it objectively reasonable for him to look at the file when he testified that he didn't really know how the hash matching worked at the time that he reviewed the file? Right. So this is something I wanted to clear up. So at the time that he viewed the file, he understood Google's hash matching to be hard hash matching. Kind of a mistake of fact, and Judge Pam, I think maybe this goes to what we were talking about. The mistake of fact sort of analysis that's present in hearing. He understood it to be hard hash matching. His understanding then changed when he went to the prosecutor to seek the Google warrant. The prosecutor at that point said, I'm not actually sure Google's technology works the way you think it's working. And from that point on, Detective Sullivan's understanding began to change. But at the time that he committed what Mr. Johnson claimed was a Fourth Amendment violation, he did not understand Google's technology to be perceptual. Do you then see in the record where he testified what the basis of his understanding was? I can't say exactly where it came. I presume likely from some sort of police training. He's been trained in this area, but I don't know where. But he did say what his understanding was based on. I assume it's investigations of this kind in the past, but I can't tell you if that's true or not. What we have in the record is Google telling him in the cyber tip that we haven't reviewed this file. That's what's in the record. And then we have in the record in a finding by the magistrate judge, Google saying that the way that our matching works, you can have a match and it can be intermingled with non-offending material.  And at the hearing, he testified that he didn't, before viewing the video, consult with anyone about what to do. He didn't talk to anyone at NCMEC. He didn't talk to anyone at Google. He didn't talk to any AUSA. He just looked at it. And the icing on the cake was that some of the four that he looked at, he looked at because he thought that he had seen them before, previously. And he thought that it's okay for him to look at a file without a warrant if he thinks it's the same file that he has reviewed in some other investigation previously, which I don't see matching with any precedent anywhere. So how do I take all of that and say what he did was objectively reasonable, which is essentially the touchstone of good faith? So I agree with everything you said up until the very last point. I don't understand Detective Sullivan to say that he believes he could open and view files just because he had seen similar files in the past. Let me read you what he said.  The first time, this is at JA555, he said, if I see a, this is at line 10, if I see a prepubescent child in that thumbnail engaged in the sex act, I will review that and use that for further paperwork in the case. And then that was on direct. And then he's asked the question directly by the court. And he says, at 587, JA587. No, actually, this isn't questioning by the court. This is on questioning by Mr. Jeffress on cross-examination. He's asked the question, it was a little unclear on direct. Do you just look at thumbnails or do you look at the actual videos themselves? So files, as I review, if I see a file that I might recognize, that's known child sex abuse material to me, I will watch that file to confirm that and likely use that in my future applications for search warrants. So he said that, but I would also direct your honor's attention to JA598, where he confirms to the district court that he views any of the files he receives, only on the understanding that someone at Google has historically viewed those files. So I'm not disagreeing with that language. I'm just saying that when it's read in the context of everything else that was said at the evidentiary hearing about Detective Sullivan's belief, it's not that he viewed files that he thought no one at Google had ever looked at before, and that's what matters for the private search doctrine. But that's not to take issue with the fact that he said that. It's just to say that the analysis requires more. I just have to go back to Murray for a minute because I actually think this is pretty critical. I'm looking at Murray right now, and the facts are on all fours with what happened in this case, in my view. They go to the warehouse. They converge on the South Boston warehouse and forced entry. They found the warehouse unoccupied but observed in plain view numerous burlap-wrapped bales that were later found to contain marijuana. They left without disturbing the bales, kept the warehouse under surveillance, and did not reenter it until they had a search warrant. What they saw prompted them to get the search warrant, and yet the inevitable discovery—I'm sorry, the independent source doctrine applied. Your Honor, without having Murray before me, I'm hesitant. I just read it to you. Those are the facts. Assuming those are the entirety of the facts, then I agree with you. Those are the entirety of the facts, so independent source would cover this. It seems like it would, although I'm nervous about the Supreme Court's language there, and I would— I'm really shocked that you're not better prepared to address this. I mean, this is the primary Supreme Court case on independent source, and you abandoned the independent source argument in your brief, and you didn't read the case and see that it was on all fours with this case? Your Honor, I certainly read the case, and when I was briefing this, I thought that the government had better arguments to win the day, specifically at the very least on the antecedent good faith issue that the First Circuit in Maine and the Second Circuit in Guinea have recognized, and that this court did in Thornton and Burnett. But if Murray's on all fours, I'm not sure how that helps you anyway, because the court didn't find independent source. Certainly. And then now we hear from counsel who argued Murray that on remand, the district court found no independent source and suppressed. So if the facts here are on all fours with the facts on Murray, I don't see how that advances your argument that independent source works here. Again, I would like to read Murray carefully. And if this court would like, I'm happy to submit a 28-J letter further on the point. But the fact that there was a remand and then suppression I think maybe suggests that the language that Mr. Johnson cited— I don't think we can rely on the fact that there's a remand and suppression. I mean, I just read this case to suggest that these facts support an independent source finding, and then they remand it to confirm the facts. But isn't the Supreme Court holding that under these facts there can be an independent source application? It certainly suggested that it was possible. Yes, I mean, it held that it was possible. Suggested is wrong. It held that it could potentially apply. I mean, I thought that's how Supreme Court precedents worked. They look at the facts. They say these facts support a legal conclusion, the legal conclusion that the independent source doctrine would apply. Send it back. I mean, I didn't know that we could look at what happened on remand. I don't know that we would have known that if we didn't have Judge Randolph here to tell us. I don't want to shoot—I don't want to fight anymore on Murray. If this court thinks that Murray governs, the court obviously—the government obviously supports affirming on that alternative ground. And if I made an error in that judgment, my apologies to the court. So on good faith, Davis was a case where there was undisputed precedent that the officer relied on. There was binding precedent. Binding precedent. Yes. And Justice Sotomayor said in her concurrence, that's not to say that you necessarily get good faith where the precedent is unsettled. The question was left open. And I haven't run this to ground, but the Seventh and Ninth Circuits have said that if the precedent is unsettled, you don't get good faith. That is correct, yes. Other circuits have said, well, if the precedent is unsettled, as long as, like, there's no precedent that goes against the position that the police officer took, we'll still give them the benefit of the good faith exception. And one of those cases was the Second Circuit's decision in May. Right. That's correct. But I think the Third Circuit, and I can't remember, another circuit has ruled similarly. What is the government's position about what the test should be that we should apply if we use good faith? So I think the way Katzen approaches this is correct. Katzen takes a holistic view of all the facts of the case and the status of the legal landscape at the time of the alleged Fourth Amendment violation. And then, based on a holistic analysis, asks whether or not the officer was acting in good faith and in the non-culpable way that Herring and Davis focused on. I think that's the right way to conceptualize the good faith exception when there's no binding precedent, as there was in Davis. Now, what that means is that, you know, I don't think it's necessarily the case that facts of each case were different. The legal landscape will change over time, as this case demonstrates quite well. At the time that Detectives Sullivan viewed the cyber tip videos, the Sixth and the Fifth Circuit had affirmed that hard hashing was appropriate. Now, the Second and Ninth disagree. So legal landscapes can change. The facts of the cases can change. What the officer might know can change. And that totality of the circumstances in the legal could change. But that's the analysis that I think a court needs to engage in. So Miller said what you're calling hard hash matching works. But that's based on the assumption that the match is an exact replica of the predicate video. That's right. And they said that Miller hadn't challenged that factual premise, and it was his burden, and so he loses. Wilson, the Ninth Circuit, and other courts have said that Miller got the burden backwards because the burden is on the government, not on the defendant. Correct. But let's put all of that aside and just say that, you know, he was entitled to rely on Miller when there's nothing in the record about what his understanding was based on. And Google has told him that they haven't looked at the file. And Google tells the court that their matching isn't exact matching. And he didn't undertake any investigation to understand how the matching worked. And he testifies that he didn't really have a clear understanding of how the matching worked. If those are all the facts, give me your best argument about why that's a good-faith application of following Miller. Right. So the argument is that he thought Google's technology functioned the way that the technology in Miller did. That turned out to be incorrect, but that wasn't discovered until the warrant—well, not the litigation, the application for a warrant before Judge Faruqi. So at the time that Detective Sullivan engaged in the relevant potentially Fourth Amendment violative conduct, he understood that he was following the line set out by Miller. And that proved not to be true, but it was an obvious mistake. There's nothing to suggest that it wasn't. It seems to me, though, if he's going to rely on precedent, finding or not, it seems that his reliance has to be reasonable. Do you agree? I agree with that, yes. And I think what Judge Wilkins' question is suggesting is that that was not reasonable reliance if Google told him we hadn't looked at it, and he, Sullivan, didn't make the effort to understand Google's technology. So he just made an assumption that it was like precise hash matching, but it wasn't reasonable for him to make that assumption. And if it's not, it doesn't seem that under any formulation of the good faith exception that he should be able to benefit from it. Let me give you a fact that I think is pretty critical in that regard, then. So you can see in the cyber tips that Google transmitted to NCMEC and then on to Detective Sullivan, how they report the hash match, digital fingerprint in this case, is with an MD5 value specifically. And Detective Sullivan—now, MD5 is a hard hashing value. Detective Sullivan actually testifies at the hearing in this case that he understood an MD5 value to signal an exact match, to signal hard hashing. So when he looked at those cyber tips and would have seen MD5, that would have said to Detective Sullivan hard hashing. That's why his misunderstanding came about. You can see specifically his understanding to that effect on the JA566. So was it mislabeled? Yes. But why would they say it was hard hashing when it wasn't? Yes. Google made a mistake. It is unclear whether it's Google or NCMEC, but one of the two was reporting what Google was doing as hard hashing when it wasn't. So this is not Detective Sullivan's fault. And if I haven't been clear as to how this came about, that is what happened here. So Detective Sullivan, you know, where the hiccup in the chain occurred, Google or NCMEC, take your pick. It wasn't Detective Sullivan, and that's why good faith should apply. So we would have to, I guess, for the first time in this circuit, rule that good faith applies based on a reasonable reliance on existing case law, even if it's not finding it in this circuit. And his reliance on Miller, et cetera, was reasonable because he was misinformed and told that it was hard hashing. So he thought it was right in line with the cases that had held that that falls within the private search doctrine. That's exactly right. And that's why when I was saying it's kind of a combination of the all persuasive authorities pointing in one way and a mistake of fact of the sort you see in Herring. It's those two lines of good faith authority converging in this case. It's maybe a unique combination of circumstances. To be honest, I can't tell you another case that I know of where you both have kind of no binding precedent, but a unanimous consensus of persuasive authority. And the officer thinks he's following it, but turns out he's not. I mean, I think that must be an exceptionally rare circumstance. It is the case that this court confronts. Thank you. I'm happy to talk about any of the other matters in this case, but the court has no further questions. We are also content to rest upon our briefs. Thank you. Thank you. So I think you were out of time, but we'll give you three minutes for rebuttal. Thank you very much. I'd like to hit two points quickly, and I'll start with what you were discussing at the end of your discussion with the government. And it's really the deterrence factor of the exclusionary rule here as whether good faith should apply in this circumstance. And so the case we have presented here is what are police required to do when their actions are not explicitly authorized by any binding precedent? And it's not clear whether a warrantless search would violate the Fourth Amendment. There's been a lot of arguments here about whether private search applies or doesn't. At the very least, it was certainly unclear at the time. And as the Ninth Circuit said in Holmes, we're looking at circumstances where a search is only plausibly permissible. So if you allow good faith to apply here, police will be incentivized to take risks with people's constitutional rights. They can search first, and they can let this court sort it out later because they know that even if their actions are later found to be unconstitutional, as long as this is the first time that that ruling has happened, they still get the benefit of the evidence that they've collected. But if you refuse to extend good faith here, there will be real legal deterrence. Does that really work in this factual scenario? Because if this officer believed that the law allows this, even if it wasn't binding and in this jurisdiction, and he was misled to believe that this case was exactly on all fours with the existing law at the time, and there was no contrary law at that time, like, are we deterring him from doing anything we don't want him to do? He thinks he's following the law. He's mistaken, but that wasn't his fault because somebody misinformed him and said that this was hard hashing. Well, I think here what we have to say is that then police cannot rely on non-binding precedent because, and the reason is for exactly what we saw here, like there may be mistakes. In fact, we want to incentivize police where there is no binding precedent. The only binding precedent really was Jacobson, and that's unclear as to how it applies to this situation. We want to incentivize law enforcement to seek a warrant because then you get the benefit of all the analysis Judge Faruqi did. It's the best result for society overall because police know where the clear line is. They know what they're expected to do, and it also provides maximum protection for constitutional rights. I also want to move to, we've been focusing all on the first good faith analysis with respect to the view of the cyber tip files. I want to touch briefly on the second good faith analysis. So, assuming the court concludes that there was no good faith that applied to the view of the cyber tip files. The larger question then, because that would require suppression of those four files, but the Google motion sought suppression of everything that was recovered from Mr. Johnson's Google account because the description of those files was used in the warrant for the Google account. And so, the question is whether when you have a warrant where the probable cause is supported only by tainted evidence. So, the government concedes that if you take out the descriptions of those files, the warrant for the Google account no longer has probable cause. This court has not addressed that particular scenario yet as to how good faith applies in that circumstance. There are five circuit courts that have ruled that good faith does not apply to that warrant if good faith doesn't apply to the underlying constitutional violations. It is. It's in our reply brief. We cited to the Ninth Circuit case in Atkins, which is from 2019. It's in the reply brief. I don't have the page citation for you. I can submit that afterwards. But what the Ninth Circuit has said, and many courts of appeals follow this logic, is look at the original police misconduct. If that is excused by good faith or some other exception, you can then rely in good faith on the later warrant, even if there's a finding that that was tainted. But if that underlying violation is not excused and it remains tainted, you then must exclude everything after that as fruits of that unconstitutional violation. So, things that were collected pursuant to the warrant for Mr. Johnson's Google account would have to be suppressed as fruits of that unconstitutional violation. I had a couple points on Thornton. So, the reason that Thornton doesn't control here is precisely the point I just made. So, in Thornton, the underlying alleged constitutional violation was a search of trash, trash bag. And the court found that, like, it was perfectly reasonable for police to assume that no one had an expectation of privacy in their trash. So, in that case, good faith would have applied to the underlying alleged misconduct, and therefore, the warrant could be relied upon. And then just one small point, and I don't want to go down the Murray rabbit hole again, but one significant distinction between Murray in this case is that when they applied for the warrant in Murray, they did not disclose that they had already gone into the warehouse and viewed things, where they did disclose that to judge Faruqi here. It's not entirely. It's better to withhold pertinent information than not. I'm not sure that that's what. It does illustrate, and we've cited the language in Murray in our opening brief on pages 25 and 26, that for independent source to apply, it has to be completely independent. It would have been a violation of 10b-5 of the Securities and Exchange Act for a material omission. When they put an affidavit in and say they have probable cause, when, in fact, they know it's even more than probable cause, we're certain. You know, search first and get the warrant later. I don't know that we want to have an opinion that says it's better for the police not to give pertinent information in a warrant affidavit. Is that what you're asking for? No. I'm not asking for an opinion that instructs police to do that, but I think if we go back. I don't know about the implication of what you're saying, that it's okay to withhold the pertinent information. That would make it all okay. But if you're honest, then we suppress you. It was just a distinction that I wanted to point out between this case and Murray. The court is. Thank you. The case is submitted. Thank you.
judges: Wilkins; Pan; Randolph